Michael R. Lozeau (Bar No. 142893)
Email: michael@lozeaudrury.com
Douglas J. Chermak (Bar No. 233382)
Email: doug@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Telephone: (510) 836-4200

Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Armita Ariano (Bar No. 314434)
Email: armita@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ALLOY DIE CASTING CO., a corporation,<br><br>　　　　　Defendant. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Orange County Coastkeeper ("Coastkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.     JURISDICTION AND VENUE

1.     Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction

over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On March 23, 2022, Plaintiff issued a 60-day Notice of Violation and Intent to Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and fully incorporated by reference herein, to Alloy Die Casting Co. ("ADC" or "Defendant") and Sanders Real Estate LLC ("Sanders LLC") as the owners and/or operators of the Facility. The Notice Letter informed ADC and Sanders LLC of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order 20XX-XXXX-DWQ in 2018 (effective July 1,2020)*) (hereinafter, the "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 6550 Caballero Blvd., Buena Park, California 90620 (the "Facility"). The Notice Letter informed ADC and Sanders LLC of Plaintiff's intent to file suit to enforce the Storm Water Permit and the Clean Water Act.

3.     The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region

(the "Santa Ana Regional Board" or "Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.     Sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ, nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.     Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.     **INTRODUCTION**

7.     This Complaint seeks relief for the Defendant's unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, Coastkeeper is informed and believes, and thereon alleges, that Defendant's discharges of pollutants from the Facility enter into the City of Buena Park's municipal storm sewer system, which discharges into Fullerton Creek, which then flows into Coyote Creek, which flows into the San Gabriel River and ultimately into the Pacific Ocean (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring since at least March 28, 2017, and are ongoing and

continuous.

8.     With every significant rainfall event, millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

## III.    **PARTIES**

### A.     **Orange County Coastkeeper.**

9.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California and has approximately 2,441 members. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

10.     Orange County Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Orange County. To further

these goals, Orange County Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

11.     Members of Orange County Coastkeeper live and own homes in the San Gabriel River Watershed and use and enjoy the waters to which the Facility discharges storm water. Members of Orange County Coastkeeper use these waterways to participate in a variety of water sports and other activities including, but not limited to, fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and/or engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility impairs each of these uses.

12.     Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act including, but not limited to, discharges of polluted storm water from the Facility, failure to report such pollution, and failure to act in accordance with the Storm Water Permit to improve the quality of storm water discharges from the Facility, degrades water quality and harms aquatic life in the San Gabriel River and its tributaries, and impairs Orange County Coastkeeper members' use and enjoyment of those waters, giving Plaintiff standing on behalf of its members.

13.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Plaintiff's members caused by Defendant's activities.

14.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.      The Owner and/or Operator of the Facility.**

15.     ADC is the current owner and/or operator of the Facility, and has been the owner and/or operator of the Facility since at least March 28, 2017, and is the responsible party under the Clean Water Act.

16.     Coastkeeper is informed and believes, and thereon alleges, that ADC is an active California corporation.

17.     Coastkeeper is informed and believes, and thereon alleges, that Kiara Gebhart is the registered agent for service of process for ADC located at 100 Spectrum Drive, Suite 600, Irvine, CA 92618.

18.     Coastkeeper is informed and believes, and thereon alleges, that Rick Simpson is the Chief Executive Officer and Director of ADC.

**IV.      LEGAL BACKGROUND**

**A.      The Clean Water Act.**

19.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

20.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

21.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

22.     The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

23.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

24.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

25.     The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

26.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

27.     A significant nexus is also established if waters that are tributary to navigable

waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

28.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

29.    Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

30.    A third-party enforcement action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

31.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $59,973 per day per violation for all violations. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

32.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    California's Storm Water Permit.**

33.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

34.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial

storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

35.    California is a state authorized by EPA to issue NPDES permits.

36.    In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

37.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

38.    The Storm Water Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

39.    On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the Storm Water Permit to incorporate, *inter alia*, Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

40.    In order to discharge storm water to waters of the United States lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding 17.

41.    Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, § XXI(A) (Duty to Comply).

Complaint                                    9

42.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* Storm Water Permit, Discharge Prohibition III(B).

43.     35.     The Storm Water Permit does not provide for any mixing zones by dischargers. The Storm Water Permit does not provide for any receiving water dilution credits to be applied by dischargers.

### C.     The Storm Water Permit's Requirement for BMPs that Achieve BAT and BCT.

44.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Storm Water Permit, Effluent Limitation V(A). Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

45.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).

46.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm

water discharges ("EPA Benchmarks"), which are, in part, incorporated into the Storm Water Permit via the Numeric Action Levels ("NALs") set forth in Table 2. *See* Storm Water Permit, § XI(B) (Monitoring, Sampling and Analysis).

47.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. Storm Water Permit, Effluent Limitation V(A); *See* EPA's NPDES MSGP, Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

48.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; copper – 0.0332 mg/L; zinc – 0.26 mg/L; nickel – 1.02 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

49.     The General Permit establishes annual NALs and instantaneous maximum NALs.  The following annual NALs have been established under the General Permit: TSS – 100 mg/L; copper – 0.0332 mg/L; zinc – 0.26 mg/L; nickel – 1.02 mg/L;  iron – 1.0 mg/L; N+N – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.

50.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks or NALs indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or

implemented at the Facility. *Id*.

**D.     The Storm Water Permit's Numeric Effluent Limitations and Water Quality-Based Corrective Actions.**

51.  Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E.

52.  An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceeds the instantaneous maximum NEL value. Storm Water Permit, Section V(C)(1).

53.  An exceedance of an NEL is a violation of the Storm Water Permit and the Clean Water Act. *Id.*

54.  The Facility is subject to the San Gabriel River TMDL requirements for metals and selenium, which include the following Total Instantaneous Maximum NELs: copper – 0.027 mg/L, and zinc – 0.158 mg/L. *Id.*, Attachment E.

55.     Section XX(B)(1) of the General Permit requires discharges to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations or when its discharges exceed an NEL in Attachment E.  They are required to perform the following actions:

(i)     Conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented;

(ii)     Assess the facility's SWPPP and its implementation to determine whether

additional BMPs or SWPPP implementation measures are necessary to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI); and

(iii)   Certify and submit via SMARTS documentation based upon the above facility evaluation and assessment that: additional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E); or no additional BMPs or SWPPP implementation measures are required to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E). *Id.*, § XX(B)(1).

### E.   The Storm Water Permit's Receiving Water Limitations.

56.   The Receiving Waters are ecologically sensitive areas, which provide an essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

57.   The CWA and the Storm Water Permit's Receiving Water Limitations

prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standards ("WQS"). 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); Storm Water Permit, Receiving Water Limitation VI(A).

58.     WQS establish the water quality goals for a water body. 40 C.F.R. §131.2.

59.     WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

60.     Discharges above or below WQS cause and/or contribute to impairment of the beneficial uses of the waters that receive polluted discharges.

61.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan, called a basin plan, which contains WQS for water bodies within its geographical area.

62.     The Santa Ana Regional Board adopted the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or the "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies in the Santa Ana Regional Board's region, which includes the San Gabriel River drainages. The beneficial uses of the Receiving Waters include, among others, municipal and domestic supply, water contact recreation, non-contact water recreation, wildlife habitat, warm freshwater habitat, and rare, threatened or endangered species.

63.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

64.     According to the 2018 303(d) List of Impaired Water Bodies, the Receiving Waters are listed for the following water quality impairments: pH, temperature, copper, and zinc. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

65.     Discharges of polluted storm water to the Receiving Waters pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

66.     Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the beneficial uses of the Receiving Waters.

67.     WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the water quality objectives in the Basin Plan, and the "Establishment of Numeric Criteria for Priority Toxic Pollutants in the State of California" ("CTR"), 40 C.F.R. § 131.38.

68.     The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Santa Ana Basin Plan, 4-18.

69.     The Santa Ana Basin Plan also includes a narrative WQS that establishes a toxicity standard which states that "[t]he concentrations of toxic substances in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-20.

70.     Further, the Santa Ana Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are

Complaint                                          15

harmful to human health." *See* Santa Ana Basin Plan 4-20.

71.     The Santa Ana Basin Plan also states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." Santa Ana Basin Plan 4-26.

72.     The CTR establishes numeric WQS to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008             (April             2000),             available             at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

73.     The numeric WQS established in the CTR for freshwater for zinc is 0.12 mg/L (Criteria Maximum Concentration – "CMC"), chromium is 0.016 mg/L (CMC), and for copper is 0.013 mg/L (CMC), assuming a water hardness calculation of 100 mg/L for all three parameters.

74.     The CTR numeric limits are expressed as dissolved metal concentrations.

75.     Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI(A) of the Storm Water Permit.

76.     The Storm Water Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* Storm Water Permit, Section VI(B).

77.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the Storm Water Permit.

**F.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

78.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. *Id.*, § X(B). The SWPPP must meet all of the requirements of the Storm Water Permit. *Id.*, §§ X(A)-(H); *See also id.*, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. *Id.*, § X(G).

79.    The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. *Id.*, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, § X(C).

80.    The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.*, § X.

81.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id.*

82.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. *Id.*, §§ X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. *Id.*, §§ X(B), XV.

83.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. *Id.*, §, X(B)(1).

**G.     The Storm Water Permit's Monitoring Requirements.**

84.     The Storm Water Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. *Id.*, §§ X(I), XI.

85.     The Storm Water Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the Storm Water Permit. *Id.*, §§ X(I), XI(A)-XI(D).

86.     The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See Id.*, § XI.

87.     An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id*.

88.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the Storm Water Permit. *Id.*, § XI(B).

89.     Section XI(A)(1) of the Storm Water Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

90.     Section XI(A)(2) of the Storm Water Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

91.     Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See id.*, § XI(A)(3).

92.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. *Id.*,

Complaint                                    19

§ XI(B)(4).

93.     Section XI(B)(1) of the Storm Water Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

94.     The Storm Water Permit requires dischargers to collect and analyze storm water samples from at least two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30). *Id.*, § XI(B)(3).

95.     Storm water samples must be analyzed for, *inter alia*, TSS, pH, O&G, additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, and those required under a facility's Standard Industrial Classification ("SIC") code. *Id.*, § XI(B)(6).

96.     Table 1 of the Storm Water Permit requires dischargers with SIC code 3363 (Aluminum Die Castings) to analyze storm water samples for zinc and copper.

97.     Section XI(B)(11) of the Storm Water Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

## H.     The Storm Water Permit's Exceedance Response Actions Requirements.

98.     Under the Storm Water Permit, facility operators are required to perform Exceedance Response Actions ("ERA") as appropriate whenever sampling indicates NAL exceedances.

99.   An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

100.   An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. *Id.*, § XII(A).

101.   Upon receiving NOI coverage, all permittees are deemed in "Baseline status." *See id.*, § XII(B).

102.   A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an NAL exceedance for that same parameter. *See id.*, § XII(C).

103.   Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *Id.*, § XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See id.*, §§ XII(C)(1)(a)-(c).

104.   Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See id.*, § XII(C)(1)(c).

105.   Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status,

revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See id.*, § XII(C)(2)(a)(i)-(ii).

106.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See id.*, § XII(C)(2)(a)(iii).

107.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *Id.*, § XII(C)(2)(b).

108.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *Id.*, § XII(D).

109.   A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *Id.*, § XII(D).

**I.      The Storm Water Permit's Annual Reporting Requirements.**

110.    Section XVI of the Storm Water Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

111.    The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the requirements of the Storm Water Permit, an explanation for, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See id.*, § XVI.

112.    Annual Reports are certified by the legally responsible person under penalty of perjury.

**V.      FACTUAL BACKGROUND**

    **A.      The Facility's Storm Water Permit Coverage.**

113.    Plaintiff alleges that Defendant's obtained Storm Water Permit coverage for the Facility since at least 2014 by submitting an NOI to the State Board.

114.    Plaintiff alleges that Defendant's submitted an updated NOI to SMARTS on or around February 10, 2021.

115.    The Facility's NOI identifies the operator of the Facility as Alloy Die Casting Co. with an address of 6550 Caballero Blvd., Buena Park, CA 90620.

116.    The Facility's NOI lists the Facility size as 2 acres, with 2 acres of industrial area exposed to storm water.

117.    The Facility's NOI indicates that 100% of the Facility, including rooftops, is impervious.

118.    Per the Facility SWPPP, the Facility's operating hours are Monday through

Complaint                                              23

Friday, 24 hours per day.

119.   The State Board's electronic SMARTS database lists the current Facility Waste Discharge Identification ("WDID") number as 8 30I013785.

120.   SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

121.   The NOI lists the SIC code for the Facility as 3363 (Aluminum Die-Castings).

122.   The Facility must obtain Storm Water Permit coverage for the entire Facility. *See id.*, § XVII(E)(1).

123.   Plaintiff is informed and believes, and thereon alleges, that the Defendant is required to sample storm water for copper, zinc, pH, O&G, iron, total suspended solids, aluminum, and chromium.

### B.   Industrial Activities and Pollutant Sources at the Facility.

124.   Plaintiff is informed and believes, and thereon alleges, that the Facility manufactures products from a wide array of materials (including aluminum, zinc, stainless steel, Inconel) and processes (including die casting, sand & investment casting, bar stock, and plate).

125.   Plaintiff alleges that the industrial processes that occur at the Facility include, but are not limited to, the following: die casting; metal cutting, trimming and processing; metal machining; grinding and shot blasting; vehicle and equipment maintenance; shipping and receiving materials; material storage; and the accumulation and storage of hazardous materials.

126.   Plaintiff is informed and believes, and thereon alleges, that the products and processes manufactured at the Facility have applications for a variety of industries,

including aerospace, defense, medical, automotive, and industrial.

127.   Plaintiff is informed and believes, and thereon alleges, that industrial activities occur both indoors and outdoors at the Facility.

128.   Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, which is tracked to areas of exposure and then outside of the Facility.

129.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas at the Facility include, but are not limited to, the activities and areas described in Paragraphs 124-129 herein.

130.   Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

131.   Plaintiff alleges that Defendant has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

132.   BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

133.   Plaintiff is informed and believes, and thereon alleges, Defendant's failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

134.   Plaintiff is informed and believes, and thereon alleges, that these illegal discharges of polluted storm water negatively impact Plaintiff's members' use and

enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

### C. The Facility's Storm Water Sampling Points and Discharges to the Receiving Waters.

135.   Plaintiff alleges that the Facility collects and discharges storm water from its 2-acre industrial site through at least four discharge locations.

136.   Plaintiff alleges that the discharge locations at the Facility contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.

137.   Plaintiff alleges that storm water discharges from the Facility flow into the City of Buena Park's municipal storm sewer system, which discharges into Fullerton Creek, which then flows into Coyote Creek, which then flows into the San Gabriel River, and ultimately into the Pacific Ocean.

138.   Plaintiff is informed and believes, and thereon alleges, that the Facility contains roof drainage and sheet flow runoff that takes place in paved parking areas and driveways between the two site buildings.

139.   Plaintiff is informed and believes, and thereon alleges, that storm water drains to the east of the Facility along two concrete swales located in a parking area in between the Main Building and the Die Casting/Die Storage Building.

140.   Plaintiff is informed and believes, and thereon alleges, that storm water adjacent to the Casting Room drains north into a gutter on Caballero Boulevard.

141.   The Facility's SWPPP indicates the Facility has four storm water sampling points.

142.   Plaintiff alleges that the first designated sampling point located at the Facility

Complaint                                           26

and identified by the SWPPP is DP-1, which includes runoff from the outdoor material storage yard, hazardous material/hazardous waste accumulation, material loading/unloading, and roof runoff from the Die Casting/Die Storage Building. The drainage area for DP-1 also receives storm water generated from the asphalt parking area between the Die Casting/Die Storage Building and the Main Building.

143.   Plaintiff alleges that the second designated sampling point located at the Facility and identified by the SWPPP is DP-2, which includes runoff from material storage, hazardous material/hazardous waste accumulation, propane tank, wastewater treatment system and blasting booth of the Dock area, material loading/unloading, and roof runoff from the Main Building. According to the Facility's SWPPP, DP-2 drainage area also receives storm water generated from the asphalt parking area between the Die Casting/Die Storage Building and the Main Building.

144.   Plaintiff alleges that the third designated sampling point located at the Facility and identified in the SWPPP is DP-3, which includes runoff from air compressors and dust collection system and roof runoff from the Casting Room. According to the Facility's SWPPP, DP-3 drainage area also receives storm water generated from the asphalt parking area.

145.   Plaintiff alleges that the fourth designated sampling point located at the Facility and identified in the SWPPP is DP-4, which includes runoff from the cooling tower and material loading/unloading at the loading dock on the northern portion of the Facility.

146.   Plaintiff alleges that Fullerton Creek, Coyote Creek, the San Gabriel River, and the Pacific Ocean are waters of the United States.

///

**D.      Defendant's Violations of the Storm Water Permit's Receiving Water Limitations and Discharge Prohibitions.**

147.    Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by the Defendant demonstrate that discharges from the Facility contain concentrations of copper that cause or contribute to a violation of the applicable WQS in the CTR. For example, storm water samples collected by Defendant on January 9, 2018; March 22, 2018; November 29, 2018; January 14, 2019; January 31, 2019; March 2, 2019; November 27, 2019; December 4, 2019; March 13, 2020; April 6, 2020; February 12, 2021; March 3, 2021; December 14, 2021; and March 28, 2022 all contained concentrations of copper at levels which exceed the CMC of 0.013 mg/L for copper set forth in the CTR.

148.    Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by the Defendant demonstrate that discharges from the Facility contain concentrations of zinc that cause or contribute to a violation of the applicable WQS in the CTR. For example, storm water samples collected by Defendant on January 9, 2018; March 22, 2018; November 29, 2018; January 14, 2019; January 31, 2019; March 2, 2019; November 27, 2019; December 4, 2019; March 13, 2020; April 6, 2020; February 12, 2021; March 3, 2021; December 14, 2021; and March 28, 2022 all contained concentrations of zinc at levels which exceed the CMC of 0.12 mg/L for zinc set forth in the CTR.

149.    Plaintiff is informed and believes, and thereon alleges, that storm water samples collected at the Facility's discharge points demonstrate that discharges from the Facility contain pH values that cause or contribute to a violation of the applicable WQS in the Basin Plan.

150.   The Facility's storm water samples uploaded to SMARTS on November 29, 2018; January 14, 2019; January 31, 2019; and March 2, 2019, indicate pH levels of 6 in storm water discharged from the Facility, which is outside the applicable range of the Basin Plan's range for pH.

151.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility that contain concentrations of copper and zinc and low pH readings in excess of applicable WQS adversely impact human health and the environment.

152.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility that contain concentrations of copper and zinc and low pH readings in excess of applicable WQS cause or threaten to cause pollution, contamination, or nuisance.

153.   Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI(A) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

154.   Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI(B) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

155.   Each time discharges from the Facility threaten to cause pollution or a public nuisance is a separate and distinct violation of Receiving Water Limitation VI(C) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

156.   Each time discharges from the Facility cause or threaten to cause pollution, contamination, or nuisance is a separate and distinct violation of Discharge Prohibition

III(C) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

**E.** **Defendant's Violations of the Storm Water Permit's Requirement for BMPs that achieve BAT and BCT.**

157.   Plaintiff is informed and believes, and thereon alleges, that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

158.   Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above benchmark levels established by the EPA and incorporated into the Storm Water Permit.

159.   Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual NALs.

160.   Plaintiff alleges, that on January 1, 2018; March 13, 2020; and February 12, 2021; the Facility discharged storm water that exceeded the EPA benchmark and annual NAL for total suspended solids.

161.   Plaintiff alleges that during the 2021-2022, 2020-2021, 2019-2020, 2018-2019, 2017-2018, and 2016-2017 Reporting Years, the Facility discharged storm water that exceeded the EPA benchmark and annual NAL for copper.

162.   The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively. For example, on February 12, 2021, Defendant measured a level of TSS of 128 mg/L in storm water discharged from one of the Facility's outfalls. Defendant also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on the following dates: January 9, 2018, and March 13, 2020.

163.   The levels of copper in storm water detected by the Facility have exceeded

the benchmark value and annual NAL for copper of 0.0332 mg/L established by EPA and the State Board, respectively. For example, on March 28, 2022, Defendant measured a level of copper of 0.234 mg/L from storm water discharged from one of the Facility's outfalls. That level of copper is over seven times the benchmark value and annual NAL for copper. Defendant also has measured levels of copper in storm water discharged from the Facility in excess of 0.0332 mg/L on the following dates: January 9, 2018; March 22, 2018; November 29, 2018; January 14, 2019; January 31, 2019; March 2, 2019; November 27, 2019; March 13, 2020; April 6, 2020; February 12, 2021; March 3, 2021; and December 14, 2021.

164.   The levels of zinc in storm water detected by the Facility have exceeded the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively. For example, on March 28, 2022, Defendant measured a level of zinc of 1.62 mg/L from storm water discharged from one of the Facility's outfalls. That level of copper is over six times the benchmark value and annual NAL for zinc. Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.26 mg/L on the following dates: January 9, 2018; March 22, 2018; November 29, 2018; January 14, 2019; March 2, 2019; November 27, 2019; December 4, 2019; March 13, 2020; April 6, 2020; February 12, 2021; March 3, 2021; and December 14, 2021.

165.   The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively. For example, on March 3, 2021, Defendant measured a level of aluminum of 6.87 mg/L from storm water discharged from one of the Facility's outfalls. That level of aluminum is over nine times the benchmark value

and annual NAL for aluminum. Defendant also has measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L on the following dates: January 9, 2018; November 29, 2018; January 14, 2019; December 4, 2019; March 13, 2020; April 6, 2020; February 12, 2021; and March 28, 2022.

166.   Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and benchmark values demonstrate that the Defendant has failed and continues to fail to develop and/or implement BMPs that comply with the Storm Water Permit's BAT/BCT standards.

167.   Each day that Defendant has failed to develop and implement BAT and BCT at the Facility in violation of the Storm Water Permit is a separate and distinct violation of the Clean Water Act.

168.   The Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least March 28, 2017.

**F.     Defendant's Violations of the Storm Water Permit's Numeric Effluent Limitations.**

169.   Plaintiff is informed and believes, and thereon alleges, that the Facility has exceeded the applicable total instantaneous maximum NELs for copper and zinc during the 2020-2021 and 2021-2022 Reporting Years in violation of Effluent Limitation V(C)(1) of the Storm Water Permit.

170.   During the 2020-2021 Reporting Year, storm water discharges collected and analyzed by Defendant from the Facility from Discharge Points 1, 2, 3, and 4, respectively, on both February 12, 2021, and March 3, 2021, all contained levels of copper in excess of 0.027 mg/L, the Total Instantaneous Maximum NEL for copper.

171.   During the 2021-2022 Reporting Year, storm water discharges collected and

analyzed by Defendant from the Facility from Discharge Points 1, 2, 3, and 4, respectively, on both December 14, 2021, and March 28, 2022, all contained levels of copper in excess of 0.027 mg/L, the Total Instantaneous Maximum NEL for copper.

172.   During the 2020-2021 Reporting Year, storm water discharges collected and analyzed by Defendant from the Facility from Discharge Points 1, 2, and 3, respectively, on both February 12, 2021, and March 3, 2021, all contained levels of zinc in excess of 0.158 mg/L, the Total Instantaneous Maximum NEL for zinc.

173.   During the 2021-2022 Reporting Year, storm water discharges collected and analyzed by Defendant from the Facility from Discharge Points 1 and 4, respectively, on both December 14, 2021, and March 28, 2022, all contained levels of zinc in excess of 0.158 mg/L, the Total Instantaneous Maximum NEL for zinc.

174.   Each day Defendant exceeds the Storm Water Permit's numeric effluent limitations is a separate and distinct violation of the Clean Water Act.

175.    Defendant has been in violation of the Storm Water Permit's numeric effluent limitations since March 3, 2021.

**G.**   **Defendant's Violations of the Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

176.   The Facility's SWPPP is publicly available via the SMARTS database and is dated January 2017.

177.   Plaintiff is informed and believed, and thereon alleges that the SWPPP referenced in Paragraph 176 is the current SWPPP for the Facility.

178.   Plaintiff is informed and believed, and thereon alleges that Defendant has failed and continues to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of SWPPP requirements of the Storm Water Permit.

179.   Plaintiff alleges that the SWPPP fails to include an Annual Evaluation in violation of Section X(A)(9) of the Storm Water Permit.

180.   Plaintiff alleges that the SWPPP's Site Map fails to demonstrate vehicle maintenance areas as well as locations of nearby municipal storm drain inlets that receive the Facility's industrial storm water discharges in violation of Section X(E) of the Storm Water Permit.

181.   Plaintiff alleges that the Facility's SWPPP fails to identify areas of the Facility where the minimum BMPs will not adequately reduce or prevent pollutants in storm water discharges in violation of Section V(G)(2)(b) of the Storm Water Permit.

182.   Plaintiff alleges that the SWPPP fails to implement advanced BMPs as required by Section X(H) of the Storm Water Permit.

183.   Plaintiff alleges that Defendant failed to amend the SWPPP with applicable TMDL NEL exceedance information, and also failed to certify and submit the revised SWPPP to SMARTS, in violation of Section VII(C)(3) of the Storm Water Permit.

184.   Plaintiff is informed and believes, and thereon alleges that Defendant has failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants and consistent exceedances of applicable NALs, NELs, and water quality standards.

185.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to include Inconel as a potential pollutant source in the SWPPP's pollutant source assessment.

186.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to indicate in that SWPPP that chromium and iron is present at the Facility, as well as any associated BMPs to control the discharge of these pollutants.

187.   Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

188.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least March 28, 2017.

**H.    Defendant's Violations of the Storm Water Permit's Monitoring Requirements.**

189.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

190.   Precipitation data obtained from the National Oceanic and Atmospheric Administration demonstrates that there were numerous QSEs at the Facility during the past several Reporting Years that Defendant failed to monitor. *See* Notice Letter, Attachment A.

191.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to collect storm water discharge samples from all QSEs as required by Section XI(B)(3) of the Storm Water Permit as follows:

- Failure to collect and analyze storm water samples from all outfalls during the first half of the 2018-2019 Reporting Year.

- Failure to collect and analyze a second sample from all outfalls during the first half of the 2021-2022 Reporting Year.

192.   Plaintiff is informed and believes, and thereon alleges, that the storm water samples collected by Defendant on January 9, 2018; January 14, 2019; March 13, 2020;

and April 6, 2020, were not from QSEs.

193.    Plaintiff is informed and believes, and thereon alleges, that Defendant failed to collect and analyze storm water discharges from the following required QSEs:

- One of the required QSEs during the second half of the 2017-2018 Reporting Year.

- Both of the required QSEs during the second half of the 2019-2020 Reporting Year.

194.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to analyze storm water discharges from the Facility for chromium since March 28, 2017.

195.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to analyze storm water discharges from the Facility for iron since at least November 29, 2018.

196.   Plaintiff is informed and believes, and thereon alleges, that Defendant has never monitored the storm water outfall located between Outfalls 2 and 3 on Miller Street.

197.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the Storm Water Permit's MIP and monitoring requirements since at least March 28, 2017.

198.   Plaintiff is informed and believes, and thereon alleges, that the Defendant is in violation of the Storm Water Permit and the Clean Water Act because it has failed and continues to fail to adequately develop, implement, and/or revise its MIP in violation of the Storm Water Permit's MIP requirements.

199.   Every day that Defendant operates with an inadequately developed, revised, and/or implemented MIP is a separate and distinct violation of the Storm Water Permit

and the Clean Water Act.

## I.  Defendant's Failure to Perform Water Quality-Based Corrective Action.

200.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to comply with water quality-based corrective actions in violation of Section XX(B)(1) of the Storm Water Permit, including failing to conduct the required Facility evaluations, failing to properly assess the Facility's SWPPP, and submitting the required documentation to SMARTS.

## J.  Defendant's Violations of the Storm Water Permit's Exceedance Response Action Requirements.

201.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Level 2 ERA Technical Report for discharges of copper and zinc during the 2019-2020 Reporting Year fails to: (i) include an evaluation of additional BMPs that would reduce NAL exceedances; (ii) estimated costs of the additional BMPs; and (iii) analyze the basis for the selection of BMPs implemented.

202.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to take Exceedance Response Actions as required by Storm Water Permit Section XII.

203.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been in daily and continuous violation of the Storm Water Permit Exceedance Response Actions requirements since at least February 28, 2020.

204.   Plaintiff is informed and believes, and thereon alleges, that every day the Facility operates without timely submitting and implementing all required ERA documentation is a separate and distinct violation of the Storm Water Permit and the Clean

Water Act.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violations of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Requirement for BMPs that Achieve BAT and BCT.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

205.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

206.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT in violation of Effluent Limitation V(A) of the Storm Water Permit and the Clean Water Act, 33 U.S.C. § 1311(b).Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the Storm Water Permit and the CWA. Storm Water Permit, Effluent Limitation V(A); 33 U.S.C. § 1311(b).

207.   Each day since March 28, 2017, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

208.   Defendant has been in violation of the BAT/BCT requirements every day since March 28, 2017.   Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

///

## SECOND CAUSE OF ACTION
### Violations of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Numeric Effluent Limitations.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

209.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

210.   Defendant has discharged storm water from the Facility on numerous occasions, as set forth above, in violation of Effluent Limitation V(C) set forth in the Storm Water Permit.

211.   Each day that storm water discharged from each discrete monitoring point at the Facility exceeded the NELs for copper and zinc for the second time during a Reporting Year is a separate and distinct violation of Effluent Limitation V(C) of the Storm Water Permit.

212.   Defendant's violations will continue each day it discharges levels of copper and zinc in violation of the effluent limitations of the Storm Water Permit and the Clean Water Act.

213.   Each and every violation of Effluent Limitation V(C) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## THIRD CAUSE OF ACTION
### Defendant's Discharges of Contaminated Storm Water in Violation of Storm Water Permit's Receiving Water Limitations and Discharge Prohibitions.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

214.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

215.   Plaintiff is informed and believes, and thereon alleges that, within the

Complaint                                    39

applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards have and continue to be discharged each time storm water discharges from the Facility.

216.   Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that adversely affect human health and the environment have and continue to be discharged each time storm water discharges from the Facility.

217.   Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that cause or threaten to cause contamination, pollution, and nuisance have and continue to be discharged each time storm water discharges from the Facility.

218.   Plaintiff is informed and believes, and thereupon alleges, that since at least March 28, 2017, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards for copper, zinc, and pH in violation of Receiving Water Limitations VI(A), VI((B), and VI(C), and Discharge Prohibition III(D) of the Storm Water Permit.

219.   Every day since at least March 28, 2017, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).   These violations are ongoing and continuous.

///

///

///

## FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

220.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

221.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continue to fail to develop, implement, and/or revise an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

222.   Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

223.   Each day since March 28, 2017, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

224.   Defendant has been in violation of the General Permit's SWPPP requirements every day since March 28, 2017.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan and Perform Required Monitoring in Violation of the Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

225.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

226.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendant has failed and continue to fail to develop, implement,

and/or revise an adequate MIP and monitoring program for the Facility, in violation of the Storm Water Permit.

227.    Defendant's ongoing failure to develop, implement, and/or revise an adequate MIP and monitoring program is evidenced by, *inter alia*, Defendant's failure to collect and analyze samples from all storm water discharge locations at the Facility and Defendant's failure to collect and analyze samples from all QSEs.

228.    Defendant has been in violation of the Storm Water Permit monitoring requirements at the Facility every day from March 28, 2017, to the present.

229.    Defendant will continue to be in violation of Sections X(I) and XI of the Storm Water Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

230.    Each day since at least March 28, 2017, that Defendant has failed to develop, implement and/or revise an adequate MIP and monitoring program for the Facility in violation of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).    The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Clean Water Act.

## SIXTH CAUSE OF ACTION
**Defendant's Failure to Perform Water Quality-Based Corrective Actions as Required by the Storm Water Permit.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

231.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

232.    Defendant is required to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations or

when its discharges exceed an NEL.

233. Defendant has failed to conduct the required Facility evaluations, failed to properly assess the Facility's SWPPP, and failed to submit the required documentation to SMARTS

234. Every day since March 28, 2017, that Defendant has failed to complete the required water quality-based corrective actions in a violation of Section XX(B)(1) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

235. Defendant has been in violation of the Storm Water Permit's water quality-based corrective action requirements every day since March 28, 2017. Defendant continues to be in violation of these requirements each day that it fails to complete the required actions.

**SEVENTH CAUSE OF ACTION**
**Defendant's Failure to Comply with Storm Water Permit's Requirement for Exceedance Response Actions.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

236. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

237. Section XII(D)(2)(a) of the Storm Water Permit requires that an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report contain, inter alia, when implemented BMPs are not expected to eliminate future NAL exceedances, "1) [a]n evaluation of additional BMPs that would reduce or prevent NAL exceedances; 2) [e]stimated costs of additional BMPs evaluated; and, 3) [a]n analysis describing the basis for the selection of BMPs implemented in lieu of the additional BMPs evaluated but not implemented."

238. Defendant has failed to submit an Industrial Activity BMPs Demonstration

Level 2 ERA Technical Report that complies with the requirements of Section XII(D)(2)(a) of the Storm Water Permit.

239.   Each day since at least February 28, 2020, that Defendant has failed to prepare and submit an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). This is an ongoing and continuous violation of the Clean Water Act.

## VII.   RELIEF REQUESTED

WHEREFORE, Plaintiff prays judgment against Defendant as set forth hereafter and respectfully requests that this Court grant the following relief:

   a.   Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

   b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the Storm Water Permit;

   c.   Enjoin Defendant from further violating the substantive and procedural requirements of the Storm Water Permit;

   d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

   e.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

   f.   Order Defendant to comply with the MIP requirements of the General Permit, including ordering supplemental monitoring to compensate for past

monitoring violations;

g.  Order Defendant to prepare a SWPPP for the Facility consistent with the requirements of the Storm Water Permit and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

i.  Order Defendant to prepare an adequate Level 2 ERA Technical Report;

j.  Order Defendant to pay civil penalties of up to $59,973 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4;

k.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

l.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

m.  Award any such other and further relief as this Court may deem appropriate.


Dated: May 27, 2022                     Respectfully submitted,


                                        /s/ *Douglas J. Chermak*
                                        Douglas J. Chermak
                                        Attorneys for Plaintiff
                                        Lozeau Drury LLP

# EXHIBIT A



**LOZEAU DRURY** LLP     T 510.836.4200     1939 Harrison Street, Ste. 150     www.lozeaudrury.com
                        F 510.836.4205     Oakland, CA 94612                 doug@lozeaudrury.com

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

March 23, 2022

Rick Simpson, President & CEO            Sanders Real Estate LLC
Eddie Murillo, Maintenance Supervisor    Eric Sanders, Manager/Member
Loan Ta, Quality Engineer                3701 Conant Street
Alloy Die Casting Co.                    Long Beach, CA 90808
6550 Caballero Blvd.
Buena Park, CA 90620

**VIA FIRST CLASS MAIL**

Kiara Gebhart                               Maureen O'Gara
Registered Agent for Service of Process     Registered Agent for Service of Process
for Alloy Die Casting Co.                   for Sanders Real Estate LLC
100 Spectrum Center Drive, Suite 600        21800 Oxnard Street, Suite 300
Irvine, CA 92618                            Woodland Hills, CA 91367

**Re:   Notice of Violations and Intent to File Suit under the Federal Water**
**      Pollution Control Act ("Clean Water Act") (33 U.S.C. §§ 1251 *et seq.*)**

Dear Messrs. Simpson, Sanders and Murillo and Ms. Ta:

      I am writing on behalf of Orange County Coastkeeper ("OCC") in regard to violations of
the Clean Water Act[1] ("CWA" or the "Act") and California's General Industrial Storm Water
Permit[2] (the "General Permit" or "Permit") occurring at Alloy Die Casting Co.'s industrial
facility located at 6550 Caballero Blvd., Buena Park, California 90620 ("Facility"). The purpose
of this letter ("Notice Letter") is to put Alloy Die Casting Co. and Sanders Real Estate LLC
(individually and collectively, "Owner" and/or "Operator") as the responsible owner(s) and/or
operator(s) of the Facility, on notice of the violations of the General Permit occurring at the

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water
Resources Control Board Order No. 2014-0057-DWQ, as amended in 2015 and 2018.

Alloy Die Casting Co.
March 23, 2022
Page 2

Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the General Permit are violations of the CWA. As explained below, the Owner and/or Operator is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1).

As required by the Clean Water Act, this Notice Letter provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, OCC hereby places the Owner and/or Operator of the Facility on formal notice that, after the expiration of sixty days from the date of this Notice Letter, OCC intends to file suit in federal court against the Owner and/or Operator of the Facility under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit. These violations are described more extensively below.

## I.     Background.

### A.     Orange County Coastkeeper.

OCC is a non-profit 501(c)(3) public benefit corporation organized under the laws of California with its main office at 3151 Airway Ave., Suite F-110, Costa Mesa, California 92626. Founded in 1999, OCC has approximately 1,300 members who live and/or recreate in and around the Orange County area. OCC is dedicated to protecting and promoting water resources that are swimmable, drinkable, fishable, and sustainable in the inland and coastal waters of Orange County including the San Gabriel River, and tributaries to the San Gabriel River. To further this mission, OCC actively seeks federal and state implementation of the Clean Water Act. Where necessary, OCC directly initiates enforcement actions on behalf of itself and its members.

Members of OCC reside and own homes in Orange County, and near Fullerton Creek, Coyote Creek, the San Gabriel River, and its terminus at the Pacific Ocean (hereinafter "Receiving Waters"). As explained in detail below, the Facility continuously discharges pollutants into the Receiving Waters, in violation of the Clean Water Act and the General Permit. OCC members use the Receiving Waters to swim, wade, surf, standup paddleboard, boat, kayak, bird watch, view wildlife, hike, bike, walk, and run. Additionally, OCC members use the waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs OCC's members' use and enjoyment of these waters. Further, discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of OCC's members have been, are

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 3

being, and will continue to be adversely affected by the Owner and/or Operator's failure to comply with the Clean Water Act and the General Permit.

### B.     The Owner and/or Operator of the Facility.

Information available to OCC indicates that Alloy Die Casting Co. ("ADC") is an owner and/or operator of the Facility.  ADC is currently an active California corporation.  The registered agent for service is: Kiara Gebhart, located at 100 Spectrum Drive, Suite 600, Irvine, CA 92618. Rick Simpson is listed as the Chief Executive Officer and Director of ADC on ADC's Statement of Information filed with the California Secretary of State on February 3, 2021.  Information available to OCC indicates that the owner of the land upon which ADC operates its industrial business is Sanders Real Estate LLC. A landowner may be liable for violations of the Clean Water Act where the owner has knowledge and control of the actions giving rise to the violations of the Act.  Eric Sanders is listed as Sanders Real Estate LLC's member and/or manager on the California Secretary of State Limited Liability Company Statement of Information form filed on December 09, 2021.

### C.     The Facility Site Description and Industrial Activities.

According to ADC's website, the Facility manufactures products from a wide array of materials (including aluminum, zinc, stainless steel, Inconel) and processes (including die casting, sand & investment casting, bar stock, and plate).  These products have applications for a variety of industries, including aerospace, defense, medical, automotive, and industrial.  On information and belief, OCC alleges that the industrial processes that occur at the Facility include, but are not limited to, the following: die casting; metal cutting, trimming and processing; metal machining; grinding and shot blasting; vehicle and equipment maintenance; shipping and receiving materials; material storage; and the accumulation and storage of hazardous materials.  The Facility's Storm Water Pollution Prevention Plan ("SWPPP") indicates that the Facility operates Monday – Friday, 24 hours/day.

### D.     The Facility's Storm Water Permit Coverage

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the General Permit ("NOI") to the California State Water Resources Control Board (the "State Board") to obtain General Permit coverage.  *See* General Permit, Finding #12.  Upon information and belief, ADC obtained Permit coverage for the Facility since at least 2014, and updated their NOI on February 10, 2021.  The Facility's NOI identifies the operator of the Facility as Alloy Die Casting Co with an address of 6550 Caballero Blvd., Buena Park, CA 90620.  The NOI lists the Facility site size as 2 acres, with all 2 acres of industrial area exposed to storm water.  The Facility's SWPPP indicates 100% of the industrial area(s) are impervious. The Waste Discharger Identification number for the Facility listed on documents submitted to the State Board and the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board") is 8 30I013785.  In its NOI, ADC certifies that the Facility is classified under SIC code 3363 (Aluminum Die-Castings).  The Facility must obtain Storm Water Permit

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 4

coverage for the entire facility.  *See* Storm Water Permit, Section XVII.E.1.  Information available to OCC demonstrates that the Owner and/or Operator is required to sample storm water for copper, zinc, pH, oil & grease, iron, total suspended solids, aluminum, and chromium.

## E.    Discharges from the Facility.

The Facility collects and discharges storm water from its 2-acre industrial site through at least four discharge locations.  On information and belief, OCC alleges that the discharge locations contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.  On information and belief, OCC alleges that stormwater discharges from the Facility flow into the City of Buena Park's municipal storm sewer system, which discharges into Fullerton Creek, which then flows into Coyote Creek, which flows into the San Gabriel River, and ultimately into the Pacific Ocean.

## F.    Waters Receiving the Facility's Discharges.

With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations such as the Facility pour into storm drains and local waterways.  The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.  Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife.  These contaminated discharges can and must be controlled for the ecosystem to regain its health.

The Regional Board has identified beneficial uses of the Receiving Waters and established water quality standards for them and their tributaries in the "Water Quality Control Plan for the Santa Ana River Basin (Region 8)," generally referred to as the Basin Plan.  *See* http://www.swrcb.ca.gov/rwqcb8/water_issues/programs/basin_plan/index.shtml.  The beneficial uses of these waters include, among others, municipal and domestic supply, water contact recreation, non-contact water recreation, wildlife habitat, warm freshwater habitat, and rare, threatened or endangered species.

The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing and aesthetic enjoyment in conjunction with the above activities."  *Id.* at 3-3.  Contact recreation use includes fishing and wading.  *Id.*

The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health."  *Id.* at 4-6.  The Basin Plan includes a narrative suspended and settleable solids standard which states that "[i]nland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses..."  *Id.* at 4-19.  The Basin Plan includes a toxicity standard that "[t]he concentrations of contaminants in

Alloy Die Casting Co.
March 23, 2022
Page 5

waters which are existing or potential sources of drinking water shall not occur at levels that are harmful to human health." *Id.* at 4-20. The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5…" *Id.* at 4-18. The Basin Plan contains a narrative floatables standard which states that "[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affect beneficial uses." *Id.* at 4-3. The Basin Plan contains a narrative color standard which states that "[w]aste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses." *Id.*

The EPA has adopted a freshwater numeric water quality standard for copper of 0.013 mg/L (Criteria Maximum Concentration – "CMC") for chromium of 0.016 mg/L (CMC) and for zinc of 0.120 mg/L (CMC). 65 Fed.Reg. 31712 (May 18, 2000) ("California Toxics Rule" or "CTR").[3]

The State of California maintains a list of impaired waterways pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d). Reach 1 of the San Gabriel River is impaired for pH and temperature. The San Gabriel River Estuary is impaired for copper, among other pollutants. Coyote Creek is impaired for copper and zinc, among other pollutants.

Attachment E of the General Permit includes a San Gabriel River Metals and Selenium TMDL [Total Maximum Daily Load] for industrial storm water discharges that sets a TMDL-related numeric effluent limitation ("NEL") for Coyote Creek or its tributary/ies. For discharges applicable to the Facility, it sets a Total Copper Instantaneous Maximum NEL of 0.027 mg/L and a Total Zinc Instantaneous Maximum NEL of 0.158 mg/L.

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").[4] The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs. The following annual NALs have been established under the General Permit: TSS – 100 mg/L; O&G – 15 mg/L; copper – 0.0332 mg/L; zinc – 0.26 mg/L; iron – 1.0 mg/L; and aluminum – 0.75 mg/L. The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and oil & grease ("O&G") – 25 mg/L.

## II.    Alleged Violations of the Clean Water Act and the General Permit.

### A.    Discharges in Violation of the Permit.

The Owner and/or Operator has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm

---

[3] These values are hardness dependent, and correspond to a total hardness of 100-125 mg/L, which is the default listing in the California Toxics Rule.
[4] The Benchmark Values can be found at https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_finalpermit.pdf.

Alloy Die Casting Co.
March 23, 2022
Page 6

water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit.  The discharge of pollutants without an NPDES permit, or in violation of an NPDES permit, is illegal.  *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).  The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT and BCT.  Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  *See* General Permit, Effluent Limitation V(A).  BAT and BCT include both nonstructural and structural measures.  General Permit, Section X(H).  Conventional pollutants are total suspended solids, oil and grease, pH, biochemical oxygen demand, and fecal coliform. 40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional. Id.; 40 C.F.R. § 401.15.

Effluent Limitation V(C) of the General Permit requires discharges to comply with applicable TMDL-specific permit requirement set forth in Attachment E.  "An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value."  General Permit, Effluent Limitation V(C)(1).  An exceedance of an NEL is a violation of the General Permit.  *Id.*

In addition, Discharge Prohibition III(B) of the General Permit prohibits the discharge of liquids or materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(C) of the General Permit prohibits storm water discharges that contain pollutants in quantities that threaten to cause pollution or a public nuisance.

Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit also prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards.  The General Permit does not authorize the application of any mixing zones for complying with Receiving Water Limitation VI(A) of the General Permit.  As a result, compliance with this provision is measured at the Facility's discharge monitoring locations.

The Owner and/or Operator has discharged and continues to discharge storm water with unacceptable levels of pH, copper, and zinc in violation of the General Permit.  The Facility's sampling and analysis results reported to the Regional Board as well as OCC's sampling results confirm these discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 7

i.        **Exceedances of Total Instantaneous Maximum NELs.**

The following discharges of pollutants from the Facility have contained concentrations of copper and zinc in excess of the applicable total instantaneous maximum NELs for those pollutants.

| Sampling Date | Parameter | Observed Concentration | Total Instantaneous Maximum NEL | Outfall/Discharge Location |
|---|---|---|---|---|
| 12/14/2021 | Copper | 0.074 mg/L | 0.027 mg/L | Discharge Point 1 |
| 12/14/2021 | Copper | 0.038 mg/L | 0.027 mg/L | Discharge Point 2 |
| 12/14/2021 | Copper | 0.074 mg/L | 0.027 mg/L | Discharge Point 3 |
| 12/14/2021 | Copper | 0.103 mg/L | 0.027 mg/L | Discharge Point 4 |
| 3/3/2021 | Copper | 0.12 mg/L | 0.027 mg/L | Discharge Point 1 |
| 3/3/2021 | Copper | 0.171 mg/L | 0.027 mg/L | Discharge Point 2 |
| 3/3/2021 | Copper | 0.119 mg/L | 0.027 mg/L | Discharge Point 3 |
| 3/3/2021 | Copper | 0.134 mg/L | 0.027 mg/L | Discharge Point 4 |
| 2/12/2021 | Copper | 0.214 mg/L | 0.027 mg/L | Discharge Point 1 |
| 2/12/2021 | Copper | 0.265 mg/L | 0.027 mg/L | Discharge Point 2 |
| 2/12/2021 | Copper | 0.12 mg/L | 0.027 mg/L | Discharge Point 3 |
| 2/12/2021 | Copper | 0.204 mg/L | 0.027 mg/L | Discharge Point 4 |
| 12/14/2021 | Zinc | 0.377 mg/L | 0.158 mg/L | Discharge Point 1 |
| 12/14/2021 | Zinc | 0.354 mg/L | 0.158 mg/L | Discharge Point 4 |
| 3/3/2021 | Zinc | 0.416 mg/L | 0.158 mg/L | Discharge Point 1 |
| 3/3/2021 | Zinc | 0.387 mg/L | 0.158 mg/L | Discharge Point 2 |
| 3/3/2021 | Zinc | 0.261 mg/L | 0.158 mg/L | Discharge Point 3 |
| 2/12/2021 | Zinc | 0.847 mg/L | 0.158 mg/L | Discharge Point 1 |
| 2/12/2021 | Zinc | 0.302 mg/L | 0.158 mg/L | Discharge Point 2 |
| 2/12/2021 | Zinc | 0.252 mg/L | 0.158 mg/L | Discharge Point 3 |
| 2/12/2021 | Zinc | 0.258 mg/L | 0.158 mg/L | Discharge Point 4 |

These unlawful discharges from the Facility are ongoing.  Each time there is a second or additional discharge of storm water (within a reporting year) containing pollutants in excess of an applicable total instantaneous maximum NEL constitutes a separate violation of the General Permit and the Act.  The applicable total instantaneous maximum NELs for copper and zinc for the San Gabriel River Metals and Selenium TMDL went into effect on July 1, 2020.  The Facility Owner and/or Operator is subject to penalties for violations of the General Permit and the Act since February 12, 2021.

Alloy Die Casting Co.
March 23, 2022
Page 8

## ii.        Discharges in Violation of Permit Conditions.

The following discharges of pollutants from the Facility have contained concentrations of zinc and copper in excess of the applicable numerical water quality standards established by the EPA and the Basin Plan, and a measurement of pH outside of the applicable range prescribed by the Basin Plan.  They have thus violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A), VI(B), and VI(C) of the General Permit; and are evidence of ongoing violations of Effluent Limitation V(A) of the General Permit.

| Sampling Date | Parameter | Observed Concentration | CTR value / Basin Plan Water Quality Objective | Outfall/Discharge Location |
|---|---|---|---|---|
| 12/14/2021 | Copper | 0.074 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 12/14/2021 | Copper | 0.038 mg/L | 0.013 mg/L (CMC) | Discharge Point 2 |
| 12/14/2021 | Copper | 0.074 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 12/14/2021 | Copper | 0.103 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 3/3/2021 | Copper | 0.12 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 3/3/2021 | Copper | 0.171 mg/L | 0.013 mg/L (CMC) | Discharge Point 2 |
| 3/3/2021 | Copper | 0.119 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 3/3/2021 | Copper | 0.134 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 2/12/2021 | Copper | 0.214 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 2/12/2021 | Copper | 0.265 mg/L | 0.013 mg/L (CMC) | Discharge Point 2 |
| 2/12/2021 | Copper | 0.12 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 2/12/2021 | Copper | 0.204 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 4/6/2020 | Copper | 0.018 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 4/6/2020 | Copper | 0.024 mg/L | 0.013 mg/L (CMC) | Discharge Point 2 |
| 4/6/2020 | Copper | 0.037 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 3/13/2020 | Copper | 0.037 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 3/13/2020 | Copper | 0.13 mg/L | 0.013 mg/L (CMC) | Discharge Point 2 |
| 3/13/2020 | Copper | 0.076 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 3/13/2020 | Copper | 0.146 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 12/4/2019 | Copper | 0.026 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 12/4/2019 | Copper | 0.019 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 12/4/2019 | Copper | 0.024 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 11/27/2019 | Copper | 0.098 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 11/27/2019 | Copper | 0.066 mg/L | 0.013 mg/L (CMC) | Discharge Point 2 |
| 11/27/2019 | Copper | 0.054 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 11/27/2019 | Copper | 0.044 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 3/2/2019 | Copper | 0.078 mg/L | 0.013 mg/L (CMC) | 6550 office parking lot |
| 3/2/2019 | Copper | 0.044 mg/L | 0.013 mg/L (CMC) | 6556 office parking lot |
| 3/2/2019 | Copper | 0.08 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 3/2/2019 | Copper | 0.024 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 1/31/2019 | Copper | 0.155 mg/L | 0.013 mg/L (CMC) | 6550 office parking lot |

Alloy Die Casting Co.
March 23, 2022
Page 9

| 1/31/2019 | Copper | 0.157 mg/L | 0.013 mg/L (CMC) | 6556 office parking lot |
|---|---|---|---|---|
| 1/31/2019 | Copper | 0.058 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 1/31/2019 | Copper | 0.049 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 1/14/2019 | Copper | 0.0176 mg/L | 0.013 mg/L (CMC) | 6550 office parking lot |
| 1/14/2019 | Copper | 0.0286 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 11/29/2018 | Copper | 0.066 mg/L | 0.013 mg/L (CMC) | 6550 office parking lot |
| 11/29/2018 | Copper | 0.055 mg/L | 0.013 mg/L (CMC) | 6556 office parking lot |
| 11/29/2018 | Copper | 0.04 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 11/29/2018 | Copper | 0.036 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 3/22/2018 | Copper | 0.067 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 3/22/2018 | Copper | 0.033 mg/L | 0.013 mg/L (CMC) | Discharge Point 2 |
| 3/22/2018 | Copper | 0.051 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 3/22/2018 | Copper | 0.073 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 1/9/2018 | Copper | 0.037 mg/L | 0.013 mg/L (CMC) | Discharge Point 1 |
| 1/9/2018 | Copper | 0.055 mg/L | 0.013 mg/L (CMC) | Discharge Point 3 |
| 1/9/2018 | Copper | 0.022 mg/L | 0.013 mg/L (CMC) | Discharge Point 4 |
| 12/14/2021 | Zinc | 0.377 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 12/14/2021 | Zinc | 0.143 mg/L | 0.120 mg/L (CMC) | Discharge Point 2 |
| 12/14/2021 | Zinc | 0.354 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 3/3/2021 | Zinc | 0.416 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 3/3/2021 | Zinc | 0.387 mg/L | 0.120 mg/L (CMC) | Discharge Point 2 |
| 3/3/2021 | Zinc | 0.261 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 3/3/2021 | Zinc | 0.129 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 2/12/2021 | Zinc | 0.847 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 2/12/2021 | Zinc | 0.847 mg/L | 0.120 mg/L (CMC) | Discharge Point 2 |
| 2/12/2021 | Zinc | 0.252 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 2/12/2021 | Zinc | 0.258 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 4/6/2020 | Zinc | 0.49 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 4/6/2020 | Zinc | 0.17 mg/L | 0.120 mg/L (CMC) | Discharge Point 2 |
| 4/6/2020 | Zinc | 0.24 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 3/13/2020 | Zinc | 0.354 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 3/13/2020 | Zinc | 0.298 mg/L | 0.120 mg/L (CMC) | Discharge Point 2 |
| 3/13/2020 | Zinc | 0.229 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 3/13/2020 | Zinc | 0.67 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 12/4/2019 | Zinc | 0.205 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 12/4/2019 | Zinc | 0.237 mg/L | 0.120 mg/L (CMC) | Discharge Point 2 |
| 12/4/2019 | Zinc | 0.288 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 12/4/2019 | Zinc | 0.345 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 11/27/2019 | Zinc | 0.248 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 11/27/2019 | Zinc | 0.199 mg/L | 0.120 mg/L (CMC) | Discharge Point 2 |
| 11/27/2019 | Zinc | 0.208 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 11/27/2019 | Zinc | 0.191 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 3/2/2019 | Zinc | 0.123 mg/L | 0.120 mg/L (CMC) | 6550 office parking lot |

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 10

| | | | | |
|---|---|---|---|---|
| 3/2/2019 | Zinc | 0.199 mg/L | 0.120 mg/L (CMC) | 6556 office parking lot |
| 3/2/2019 | Zinc | 0.514 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 3/2/2019 | Zinc | 0.122 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 1/31/2019 | Zinc | 0.232 mg/L | 0.120 mg/L (CMC) | 6550 office parking lot |
| 1/31/2019 | Zinc | 0.21 mg/L | 0.120 mg/L (CMC) | 6556 office parking lot |
| 1/14/2019 | Zinc | 0.21 mg/L | 0.120 mg/L (CMC) | 6556 office parking lot |
| 1/14/2019 | Zinc | 0.377 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 1/14/2019 | Zinc | 0.3 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 11/29/2018 | Zinc | 0.431 mg/L | 0.120 mg/L (CMC) | 6550 office parking lot |
| 11/29/2018 | Zinc | 0.62 mg/L | 0.120 mg/L (CMC) | 6556 office parking lot |
| 11/29/2018 | Zinc | 0.604 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 11/29/2018 | Zinc | 0.155 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 3/22/2018 | Zinc | 0.216 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 3/22/2018 | Zinc | 0.32 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 3/22/2018 | Zinc | 0.23 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 1/9/2018 | Zinc | 0.606 mg/L | 0.120 mg/L (CMC) | Discharge Point 1 |
| 1/9/2018 | Zinc | 0.528 mg/L | 0.120 mg/L (CMC) | Discharge Point 3 |
| 1/9/2018 | Zinc | 0.174 mg/L | 0.120 mg/L (CMC) | Discharge Point 4 |
| 3/2/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6550 office parking lot |
| 3/2/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6556 office parking lot |
| 3/2/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | Discharge Point 3 |
| 1/31/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6550 office parking lot |
| 1/31/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6556 office parking lot |
| 1/31/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | Discharge Point 3 |
| 1/31/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | Discharge Point 4 |
| 1/14/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6550 office parking lot |
| 1/14/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6556 office parking lot |
| 1/14/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | Discharge Point 3 |
| 1/14/2019 | pH | 6 s.u. | 6.5 – 8.5 s.u. | Discharge Point 4 |
| 11/29/2018 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6550 office parking lot |
| 11/29/2018 | pH | 6 s.u. | 6.5 – 8.5 s.u. | 6556 office parking lot |
| 11/29/2018 | pH | 6 s.u. | 6.5 – 8.5 s.u. | Discharge Point 3 |
| 11/29/2018 | pH | 6 s.u. | 6.5 – 8.5 s.u. | Discharge Point 4 |

The information in the above table reflects data gathered from the Owner and/or Operator's self-monitoring reports during the 2017-2018, 2018-2019, 2019-2020, 2020-2021, and 2021-2022 reporting years.  OCC alleges that since at least March 23, 2017, and continuing through today, the Facility has discharged storm water contaminated with pollutants at levels that exceed one or more applicable water quality standards, including but not limited to each of the following:

- Copper – 0.013 mg/L (CMC)
- Zinc – 0.120 mg/L (CMC)
- pH – 6.5 – 8.5 s.u. (Basin Plan at 4-18)

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 11

The numbers listed above indicate that the Facility is discharging polluted storm water in violation of Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A), VI(B), and VI(C) of the General Permit.  OCC alleges that such violations also have occurred and will occur on other rain dates, including on information and belief every significant rain event that has occurred since March 23, 2017, and that will occur at the Facility subsequent to the date of this Notice Letter.  Attachment A, attached hereto, sets forth each of the specific rain dates on which OCC alleges that the Facility has discharged storm water containing impermissible and unauthorized levels of pollutants in violation of Section 301(a) of the Act as well as Effluent Limitation V(A), Discharge Prohibitions III(C) and III(D), and Receiving Water Limitations VI(A), VI(B), and VI(C) of the General Permit.[5]

### iii.    Failure to Implement BAT/BCT.

The following discharges of pollutants from the Facility have contained measurements of pollutants in excess of applicable NALs and EPA benchmarks.  The following discharges of pollutants from the Facility have violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit and are evidence of ongoing violations of Effluent Limitation V(A) of the General Permit.

| Sampling Date | Parameter | Observed Concentration | EPA Benchmark Value / Annual NAL | Outfall/Discharge Location |
|---|---|---|---|---|
| 2/12/2021 | TSS | 128 mg/L | 100 mg/L | Discharge Point 1 |
| 3/13/2020 | TSS | 122 mg/L | 100 mg/L | Discharge Point 4 |
| 1/9/2018 | TSS | 146 mg/L | 100 mg/L | Discharge Point 3 |
| 12/14/2021 | Copper | 0.074 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 12/14/2021 | Copper | 0.038 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 12/14/2021 | Copper | 0.074 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 12/14/2021 | Copper | 0.103 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 3/3/2021 | Copper | 0.12 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 3/3/2021 | Copper | 0.171 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 3/3/2021 | Copper | 0.119 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 3/3/2021 | Copper | 0.134 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 2/12/2021 | Copper | 0.214 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 2/12/2021 | Copper | 0.265 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 2/12/2021 | Copper | 0.12 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 2/12/2021 | Copper | 0.204 mg/L | 0.0332 mg/L | Discharge Point 4 |

---

[5] The rain dates on the attached table are all the days when 0.1" or more rain was observed from a weather station located at the Fullerton Municipal Airport, approximately 2.37 miles from the Facility.

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 12

| 2020-2021 Reporting Year | Copper | 0.1684 mg/L | 0.0332 mg/L | Annual average[6] |
|---|---|---|---|---|
| 4/6/2020 | Copper | 0.018 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 4/6/2020 | Copper | 0.024 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 4/6/2020 | Copper | 0.037 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 3/13/2020 | Copper | 0.037 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 3/13/2020 | Copper | 0.13 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 3/13/2020 | Copper | 0.076 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 3/13/2020 | Copper | 0.146 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 12/4/2019 | Copper | 0.026 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 12/4/2019 | Copper | 0.013 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 12/4/2019 | Copper | 0.019 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 12/4/2019 | Copper | 0.024 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 11/27/2019 | Copper | 0.098 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 11/27/2019 | Copper | 0.066 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 11/27/2019 | Copper | 0.054 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 11/27/2019 | Copper | 0.044 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 2019-2020 Reporting Year | Copper | 0.051 mg/L | 0.0332 mg/L | Annual average[7] |
| 3/2/2019 | Copper | 0.078 mg/L | 0.0332 mg/L | 6550 office parking lot |
| 3/2/2019 | Copper | 0.044 mg/L | 0.0332 mg/L | 6556 office parking lot |
| 3/2/2019 | Copper | 0.08 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 3/2/2019 | Copper | 0.024 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 1/31/2019 | Copper | 0.155 mg/L | 0.0332 mg/L | 6550 office parking lot |
| 1/31/2019 | Copper | 0.157 mg/L | 0.0332 mg/L | 6556 office parking lot |
| 1/31/2019 | Copper | 0.058 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 1/31/2019 | Copper | 0.049 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 1/14/2019 | Copper | 0.0176 mg/L | 0.0332 mg/L | 6550 office parking lot |
| 1/14/2019 | Copper | 0.00887 mg/L | 0.0332 mg/L | 6556 office parking lot |
| 1/14/2019 | Copper | 0.00511 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 1/14/2019 | Copper | 0.0286 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 11/29/2018 | Copper | 0.066 mg/L | 0.0332 mg/L | 6550 office parking lot |
| 11/29/2018 | Copper | 0.055 mg/L | 0.0332 mg/L | 6556 office parking lot |
| 11/29/2018 | Copper | 0.04 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 11/29/2018 | Copper | 0.036 mg/L | 0.0332 mg/L | Discharge Point 4 |

[6] The value in this row represents the average of all copper measurements taken at the Facility during the 2020-2021 reporting year and exceeds 0.0332 mg/L, the annual NAL for copper.
[7] The value in this row represents the average of all copper measurements taken at the Facility during the 2019-2020 reporting year and exceeds 0.0332 mg/L, the annual NAL for copper.

Alloy Die Casting Co.
March 23, 2022
Page 13

| 2018-2019 Reporting Year | Copper | 0.0564 mg/L | 0.0332 mg/L | Annual average[8] |
|---|---|---|---|---|
| 3/22/2018 | Copper | 0.067 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 3/22/2018 | Copper | 0.033 mg/L | 0.0332 mg/L | Discharge Point 2 |
| 3/22/2018 | Copper | 0.051 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 3/22/2018 | Copper | 0.073 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 1/9/2018 | Copper | 0.037 mg/L | 0.0332 mg/L | Discharge Point 1 |
| 1/9/2018 | Copper | 0.055 mg/L | 0.0332 mg/L | Discharge Point 3 |
| 1/9/2018 | Copper | 0.022 mg/L | 0.0332 mg/L | Discharge Point 4 |
| 2017-2018 Reporting Year | Copper | 0.042 mg/L | 0.0332 mg/L | Annual average[9] |
| 2016-2017 Reporting Year | Copper | 0.056 mg/L | 0.0332 mg/L | Annual average[10] |
| 12/14/2021 | Zinc | 0.377 mg/L | 0.26 mg/L | Discharge Point 1 |
| 12/14/2021 | Zinc | 0.354 mg/L | 0.26 mg/L | Discharge Point 4 |
| 3/3/2021 | Zinc | 0.416 mg/L | 0.26 mg/L | Discharge Point 1 |
| 3/3/2021 | Zinc | 0.387 mg/L | 0.26 mg/L | Discharge Point 2 |
| 3/3/2021 | Zinc | 0.261 mg/L | 0.26 mg/L | Discharge Point 3 |
| 3/3/2021 | Zinc | 0.129 mg/L | 0.26 mg/L | Discharge Point 4 |
| 2/12/2021 | Zinc | 0.847 mg/L | 0.26 mg/L | Discharge Point 1 |
| 2/12/2021 | Zinc | 0.847 mg/L | 0.26 mg/L | Discharge Point 2 |
| 2/12/2021 | Zinc | 0.252 mg/L | 0.26 mg/L | Discharge Point 3 |
| 2/12/2021 | Zinc | 0.258 mg/L | 0.26 mg/L | Discharge Point 4 |
| 2020-2021 Reporting Year | Zinc | 0.356 mg/L | 0.26 mg/L | Annual average[11] |
| 4/6/2020 | Zinc | 0.49 mg/L | 0.26 mg/L | Discharge Point 1 |
| 4/6/2020 | Zinc | 0.17 mg/L | 0.26 mg/L | Discharge Point 2 |
| 4/6/2020 | Zinc | 0.097 mg/L | 0.26 mg/L | Discharge Point 3 |
| 4/6/2020 | Zinc | 0.24 mg/L | 0.26 mg/L | Discharge Point 4 |
| 3/13/2020 | Zinc | 0.354 mg/L | 0.26 mg/L | Discharge Point 1 |
| 3/13/2020 | Zinc | 0.298 mg/L | 0.26 mg/L | Discharge Point 2 |

[8] The value in this row represents the average of all copper measurements taken at the Facility during the 2018-2019 reporting year and exceeds 0.0332 mg/L, the annual NAL for copper.
[9] The value in this row represents the average of all copper measurements taken at the Facility during the 2017-2018 reporting year and exceeds 0.0332 mg/L, the annual NAL for copper.
[10] The value in this row represents the average of all copper measurements taken at the Facility during the 2016-2017 reporting year and exceeds 0.0332 mg/L, the annual NAL for copper.
[11] The value in this row represents the average of all zinc measurements taken at the Facility during the 2020-2021 reporting year and exceeds 0.120 mg/L, the annual NAL for zinc.

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 14

| 3/13/2020 | Zinc | 0.229 mg/L | 0.26 mg/L | Discharge Point 3 |
|---|---|---|---|---|
| 3/13/2020 | Zinc | 0.67 mg/L | 0.26 mg/L | Discharge Point 4 |
| 12/4/2019 | Zinc | 0.205 mg/L | 0.26 mg/L | Discharge Point 1 |
| 12/4/2019 | Zinc | 0.237 mg/L | 0.26 mg/L | Discharge Point 2 |
| 12/4/2019 | Zinc | 0.288 mg/L | 0.26 mg/L | Discharge Point 3 |
| 12/4/2019 | Zinc | 0.345 mg/L | 0.26 mg/L | Discharge Point 4 |
| 11/27/2019 | Zinc | 0.248 mg/L | 0.26 mg/L | Discharge Point 1 |
| 11/27/2019 | Zinc | 0.199 mg/L | 0.26 mg/L | Discharge Point 2 |
| 11/27/2019 | Zinc | 0.208 mg/L | 0.26 mg/L | Discharge Point 3 |
| 11/27/2019 | Zinc | 0.191 mg/L | 0.26 mg/L | Discharge Point 4 |
| 2019-2020 Reporting Year | Zinc | 0.275 mg/L | 0.26 mg/L | Annual average[12] |
| 3/2/2019 | Zinc | 0.123 mg/L | 0.26 mg/L | 6550 office parking lot |
| 3/2/2019 | Zinc | 0.199 mg/L | 0.26 mg/L | 6556 office parking lot |
| 3/2/2019 | Zinc | 0.514 mg/L | 0.26 mg/L | Discharge Point 3 |
| 3/2/2019 | Zinc | 0.122 mg/L | 0.26 mg/L | Discharge Point 4 |
| 1/31/2019 | Zinc | 0.232 mg/L | 0.26 mg/L | 6550 office parking lot |
| 1/31/2019 | Zinc | 0.21 mg/L | 0.26 mg/L | 6556 office parking lot |
| 1/31/2019 | Zinc | 0.07 mg/L | 0.26 mg/L | Discharge Point 3 |
| 1/31/2019 | Zinc | 0.086 mg/L | 0.26 mg/L | Discharge Point 4 |
| 1/14/2019 | Zinc | 0.11 mg/L | 0.26 mg/L | 6550 office parking lot |
| 1/14/2019 | Zinc | 0.21 mg/L | 0.26 mg/L | 6556 office parking lot |
| 1/14/2019 | Zinc | 0.377 mg/L | 0.26 mg/L | Discharge Point 3 |
| 1/14/2019 | Zinc | 0.3 mg/L | 0.26 mg/L | Discharge Point 4 |
| 11/29/2018 | Zinc | 0.431 mg/L | 0.26 mg/L | 6550 office parking lot |
| 11/29/2018 | Zinc | 0.62 mg/L | 0.26 mg/L | 6556 office parking lot |
| 11/29/2018 | Zinc | 0.604 mg/L | 0.26 mg/L | Discharge Point 3 |
| 11/29/2018 | Zinc | 0.155 mg/L | 0.26 mg/L | Discharge Point 4 |
| 2018-2019 Reporting Year | Zinc | 0.27 mg/L | 0.26 mg/L | Annual average[13] |
| 3/22/2018 | Zinc | 0.216 mg/L | 0.26 mg/L | Discharge Point 1 |
| 3/22/2018 | Zinc | 0.105 mg/L | 0.26 mg/L | Discharge Point 2 |
| 3/22/2018 | Zinc | 0.32 mg/L | 0.26 mg/L | Discharge Point 3 |
| 3/22/2018 | Zinc | 0.23 mg/L | 0.26 mg/L | Discharge Point 4 |
| 1/9/2018 | Zinc | 0.606 mg/L | 0.26 mg/L | Discharge Point 1 |
| 1/9/2018 | Zinc | 0.068 mg/L | 0.26 mg/L | Discharge Point 2 |
| 1/9/2018 | Zinc | 0.528 mg/L | 0.26 mg/L | Discharge Point 3 |

[12] The value in this row represents the average of all zinc measurements taken at the Facility during the 2019-2020 reporting year and exceeds 0.120 mg/L, the annual NAL for zinc.
[13] The value in this row represents the average of all zinc measurements taken at the Facility during the 2018-2019 reporting year and exceeds 0.120 mg/L, the annual NAL for zinc.

Alloy Die Casting Co.
March 23, 2022
Page 15

| 1/9/2018 | Zinc | 0.174 mg/L | 0.26 mg/L | Discharge Point 4 |
|---|---|---|---|---|
| 2017-2018 Reporting Year | Zinc | 0.28 mg/L | 0.26 mg/L | Annual average[14] |
| 3/3/2021 | Aluminum | 6.87 mg/L | 0.75 mg/L | Discharge Point 1 |
| 3/3/2021 | Aluminum | 3.61 mg/L | 0.75 mg/L | Discharge Point 2 |
| 3/3/2021 | Aluminum | 1.4 mg/L | 0.75 mg/L | Discharge Point 3 |
| 3/3/2021 | Aluminum | 0.586 mg/L | 0.75 mg/L | Discharge Point 4 |
| 2/12/2021 | Aluminum | 5.7 mg/L | 0.75 mg/L | Discharge Point 1 |
| 2/12/2021 | Aluminum | 0.853 mg/L | 0.75 mg/L | Discharge Point 2 |
| 2/12/2021 | Aluminum | 0.878 mg/L | 0.75 mg/L | Discharge Point 3 |
| 2/12/2021 | Aluminum | 1.41 mg/L | 0.75 mg/L | Discharge Point 4 |
| 2020-2021 Reporting Year | Aluminum | 2.66 mg/L | 0.75 mg/L | Annual average[15] |
| 4/6/2020 | Aluminum | 1.5 mg/L | 0.75 mg/L | Discharge Point 1 |
| 4/6/2020 | Aluminum | 1.1 mg/L | 0.75 mg/L | Discharge Point 2 |
| 4/6/2020 | Aluminum | 0.31 mg/L | 0.75 mg/L | Discharge Point 3 |
| 4/6/2020 | Aluminum | 2.6 mg/L | 0.75 mg/L | Discharge Point 4 |
| 3/13/2020 | Aluminum | 0.392 mg/L | 0.75 mg/L | Discharge Point 1 |
| 3/13/2020 | Aluminum | 0.767 mg/L | 0.75 mg/L | Discharge Point 2 |
| 3/13/2020 | Aluminum | 0.379 mg/L | 0.75 mg/L | Discharge Point 3 |
| 3/13/2020 | Aluminum | 3.41 mg/L | 0.75 mg/L | Discharge Point 4 |
| 12/4/2019 | Aluminum | 1.43 mg/L | 0.75 mg/L | Discharge Point 1 |
| 12/4/2019 | Aluminum | 0.59 mg/L | 0.75 mg/L | Discharge Point 2 |
| 12/4/2019 | Aluminum | 1.61 mg/L | 0.75 mg/L | Discharge Point 3 |
| 12/4/2019 | Aluminum | 1.33 mg/L | 0.75 mg/L | Discharge Point 4 |
| 11/27/2019 | Aluminum | 0.176 mg/L | 0.75 mg/L | Discharge Point 1 |
| 11/27/2019 | Aluminum | 0.142 mg/L | 0.75 mg/L | Discharge Point 2 |
| 11/27/2019 | Aluminum | 0.1 mg/L | 0.75 mg/L | Discharge Point 3 |
| 11/27/2019 | Aluminum | 0.062 mg/L | 0.75 mg/L | Discharge Point 4 |
| 2019-2020 Reporting Year | Aluminum | 0.99 mg/L | 0.75 mg/L | Annual average[16] |
| 1/14/2019 | Aluminum | 1.21 mg/L | 0.75 mg/L | Discharge Point 4 |

[14] The value in this row represents the average of all zinc measurements taken at the Facility during the 2017-2018 reporting year and exceeds 0.120 mg/L, the annual NAL for zinc.
[15] The value in this row represents the average of all aluminum measurements taken at the Facility during the 2020-2021 reporting year and exceeds 0.75 mg/L, the annual NAL for aluminum.
[16] The value in this row represents the average of all aluminum measurements taken at the Facility during the 2019-2020 reporting year and exceeds 0.75 mg/L, the annual NAL for aluminum.

Alloy Die Casting Co.
March 23, 2022
Page 16

| 11/29/2018 | Aluminum | 1.71 mg/L | 0.75 mg/L | 6550 office parking lot |
| 11/29/2018 | Aluminum | 1.12 mg/L | 0.75 mg/L | 6556 office parking lot |
| 11/29/2018 | Aluminum | 0.78 mg/L | 0.75 mg/L | Discharge Point 3 |
| 11/29/2018 | Aluminum | 0.97 mg/L | 0.75 mg/L | Discharge Point 4 |

The information in the above table reflects data gathered from the Owner and/or Operator's self-monitoring reports during the 2016-2017, 2017-2018, 2018-2019, 2019-2020, 2020-2021, and 2021-2022 reporting years. In addition, OCC collected storm water samples from the Facility during a QSE on December 14, 2021 with results that demonstrate: (1) NAL exceedances for zinc, copper, aluminum, and iron; (2) Exceedances of applicable CTR levels for zinc and copper; and (3) NEL violations for zinc. OCC alleges that since March 23, 2017, the Facility has discharged storm water contaminated with pollutants at levels that exceed the applicable EPA Benchmarks and NALs for TSS, copper, zinc, and aluminum.

OCC's investigation, including its review of ADC's Storm Water Pollution Prevention Plan ("SWPPP"), ADC's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards and EPA benchmark values and NALs, indicates that the Owner and/or Operator has not implemented BAT and BCT at the Facility for its discharges of pH, TSS, copper, zinc, and aluminum, and potentially other pollutants in violation of Effluent Limitation V(A) of the General Permit. The Owner and/or Operator was required to have implemented BAT and BCT by no later than October 1, 1992, or since the date the Facility opened. Thus, the Owner and/or Operator is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

In addition, the numbers listed above indicate that the Facility is discharging polluted storm water in violation of Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the General Permit. OCC alleges that such violations also have occurred and will occur on other rain dates, including on information and belief every significant rain event that has occurred since March 23, 2017, as set forth in Attachment A, and that will occur at the Facility subsequent to the date of this Notice Letter.

Further, OCC puts the Owner and/or Operator on notice that General Permit Effluent Limitation V(A) is a separate, independent requirement with which the Owner and/or Operator must comply, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Permit's Effluent Limitations, including the Owner and/or Operator's obligation to have installed BAT and BCT at the Facility. While exceedances of the NALs demonstrate that a facility is among the worst performing facilities in the State, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented Best Management Practices ("BMPs") that achieve BAT/BCT.[17] Even though ADC submitted Exceedance Response Action

---

[17] "The NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations. The NALs are not derived directly from either BAT/BCT requirements or receiving water objectives. NAL exceedances defined in this General Permit are not, in and of

Alloy Die Casting Co.
March 23, 2022
Page 17

Plans pursuant to Section XII of the General Permit, the violations of Effluent Limitation V(A) described in this Notice Letter are ongoing.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing excess pollutants constitutes a separate violation of the General Permit and the Act. Each discharge of storm water not subject to BAT/BCT constitutes an unauthorized discharge of polluted storm water associated with industrial activity in violation of Section 301(a) of the CWA. Each day that the Facility operates without implementing BAT/BCT is a violation of the General Permit. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the Owner and/or Operator is subject to penalties for violations of the General Permit and the Act since March 23, 2017.

### B.     Failure to Develop, Implement, and/or Revise an Adequate Monitoring Plan and Comply with Monitoring Requirements.

The General Permit requires facility operators to develop and implement an adequate Monitoring Implementation Plan for visual observations and for the sampling and analysis of storm water discharges. *See* General Permit, §§ X(I), XI. The primary objective of the such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Adequate monitoring and reporting ensures that BMPs are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit. Section XI of the General Permit sets forth the monitoring and reporting requirements. The Owner and/or Operator has repeatedly violated these monitoring requirements.

### i.     Failure to Sample All Qualifying Storm Events.

Section XI(B)(2) of the General Permit requires that dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year and two QSEs within the second half of each reporting year. Section XI(B)(1) of the General Permit defines a QSE as a precipitation event that both produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. OCC alleges that local precipitation data shows that discharges from QSEs occurred on dates on which the Facility was open and conducting industrial operations, but the Facility did not collect and analyze any storm water samples. Specifically, OCC alleges that the Facility did not collect and analyze required storm water samples from storm water discharges from QSEs that occurred on the following dates:

- October 3, 2018
- October 12, 2018
- November 22, 2018

- December 5, 2018
- December 6, 2018
- July 26, 2021

themselves, violations of this General Permit." General Permit, Finding 63, p. 11. The NALs do, however, trigger reporting requirements. *See* General Permit, Section XII.

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 18

- October 4, 2021                              • December 23, 2021
- October 25, 2021

Accordingly, OCC alleges that the Owner and/or Operator failed to collect and analyze the required storm water discharges as follows:

- Failure to collect and analyze a second sample from all outfalls during the first half of the 2018-2019 reporting year
- Failure to collect and analyze a second sample from all outfalls during the first half of the 2021-2022 reporting year

This results in at least eight violations of the General Permit.  These violations of the General Permit are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the Owner and/or Operator is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since at least December 31, 2018.

### ii.    Improper Sampling from Non-Qualifying Storm Events.

On information and belief, OCC alleges that the Owner and/or Operator has collected and analyzed storm water samples from several dates that were not QSEs because they were not preceded by 48-hours with no discharge.  The Owner and/or Operator analyzed sample results collected on the following dates: January 9, 2018; January 14, 2019; March 13, 2020; and April 6, 2020.  However, based on information and belief, OCC alleges that each of those dates was preceded by either one or two days that contained storm events that produced discharges from the Facility.  Therefore, OCC alleges that the samples taken from these dates were not from QSEs and thus the Owner and/or Operator failed to collect and analyze storm water discharges from the following required QSEs:

- One of the required QSEs during the second half of the 2017-2018 reporting year
- Both of the required QSEs during the second half of the 2019-2020 reporting year.

This results in at least twelve violations of the General Permit.  These violations of the General Permit are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the Owner and/or Operator is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since at least December 31, 2017.

### iii.   Failure to Monitor Required Parameters.

In addition, information available to OCC demonstrates that the Owner and/or Operator is required to sample storm water for chromium but has failed to do since at least March 23, 2017.  Furthermore, OCC's storm water sample results collected at the Facility during the QSE on December 14, 2021, demonstrates an NAL exceedance for iron.   Because iron is a pollutant present at the Facility and present in stormwater discharges, the Owner and/or Operator must be

Alloy Die Casting Co.
March 23, 2022
Page 19

sampling for this parameter.  The Owner and/or Operator has failed to sample for iron since at least November 29, 2018.  As alleged below, the Facility failed to include these pollutants in the SWPPP's pollutant source assessment.  These violations of the General Permit are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the Owner and/or Operator is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since March 23, 2017.

### iv.   Failure to Monitor Required Outfalls.

Section XI(B) of the General Permit requires dischargers to collect and analyze discharges from all outfalls at a facility.  The Facility's December 16, 2018 Level 2 ERA Action Plan suggests that the Owner and/or Operator "[s]ample [the] loading dock between outfall two and three on Miller street [sic] to determine if this outfall is NEC."[18]  According to information available to OCC, the Owner and/or Operator has never monitored this outfall.  This results in at least 13 violations of the General Permit.  These violations of the General Permit are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the Owner and/or Operator is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since March 23, 2017.

### C.   Failure to Perform Water Quality Based Corrective Actions.

Section XX(B)(1) of the General Permit requires discharges to perform certain actions when they determine that their industrial storm water discharges are in violation of Receiving Water Limitations or when its discharges exceed an NEL in Attachment E.  They are required to perform the following actions:

Conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented;

Assess the facility's SWPPP and its implementation to determine whether additional BMPs or SWPPP implementation measures are necessary to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI); and,

Certify and submit via SMARTS documentation based upon the above facility evaluation and assessment that: additional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E); or no additional BMPs or SWPPP implementation measures are required to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E).

---

[18] OCC assumes that the reference to Miller Street is a typo that should refer to Caballero Blvd.

Alloy Die Casting Co.
March 23, 2022
Page 20

General Permit, §§ XX(B)(1).

As alleged above, ADC has consistently discharged storm water in violation of Receiving Water Limitations VI(A), VI(B), and VI(C), and its discharges have consistently exceeded NELs contained in Attachment E.  On information and belief, OCC alleges that the Owner and/or Operator has failed to comply with the requirement of Section XX.B(1) of the General Permit, including failing to conduct the required facility evaluations, failing to properly assess the facility's SWPP, and submitting the required documentation to SMARTS ["Stormwater Multiple Application and Report Tracking System"].  This results in at least 15 violations of the General Permit.  These violations of the General Permit are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, the Owner and/or Operator is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since March 23, 2017.

>    **D.      Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.**

Under the General Permit, the State Board has designated the SWPPP as the cornerstone of compliance with NPDES requirements for storm water discharges from industrial facilities, ensuring that operators meet effluent and receiving water limitations.  Section X(A)-(B) of the General Permit requires dischargers to develop and implement a SWPPP prior to beginning industrial activities that meet all of the requirements of the General Permit.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-stormwater discharges.  General Permit § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  General Permit § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  General Permit Factsheet § I(1).

Sections X(D)-(I) of the General Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.  The General Permit requires that all dischargers develop and implement a set of minimum BMPs (which are mostly non-structural BMPs) as well as any advanced BMPs (which are mostly structural) as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations.  *See* General Permit § X(H).  The General Permit requires a comprehensive assessment of potential pollutant sources, specific BMP descriptions; and a BMP summary table identifying each identified area of

Alloy Die Casting Co.
March 23, 2022
Page 21

industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  *See* General Permit §§ X(G)(2), (4)-(5).

The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* General Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the General Permit.  *See* General Permit Fact Sheet § I(2)(o).  The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  *See* General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.  *Id*.  The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  *See* General Permit §§ X(H)(4)-(5).  A Facility's BMPs must, at all times, be robust enough to meet the General Permit's and 33 U.S.C. ¶ 1342(p)(3)(A)'s requirement that all discharges associated with industrial activities be subjected to BAT and BCT.  General Permit §§ V(A), (I)(A)(1), (I)(D)(31)-(32).

Despite these clear BMP requirements, the Owner and/or Operator has been conducting and continues to conduct industrial operations at the Facility with an inadequately developed, implemented, and/or revised SWPPP.

ADC's website indicates that it manufactures products from a wide array of materials, including aluminum, zinc, stainless steel and Inconel.  Inconel is commonly comprised of nickel, chromium and iron.  The SWPPP's pollutant source assessment fails to include Inconel as a potential pollutant source and fails to identify that chromium or iron is present at Facility as well as any BMPs that might be implemented to control the discharge of these pollutants.

The SWPPP fails to comply with Section X(A)(9) of the General Permit.  The SWPPP fails to contain an Annual Evaluation.

The SWPPP fails to comply with the requirements of Section X(E) of the General Permit.  The map fails to show the locations of nearby municipal storm drain inlets that may receive the facility's industrial storm water discharges.  It fails to show vehicle maintenance areas.

The SWPPP fails to comply with Section X(G)(2)(b) of the General Permit.  The SWPPP fails to identify in the SWPPP any areas of the Facility where the minimum BMPs will not adequately reduce or prevent pollutants in the storm water discharge in compliance with Section V(A) of the General Permit.  OCC alleges that all areas of the Facility are lacking in BMPs that will achieve that reduction or prevention.  The Owner and/or Operator fails to identify advanced BMPs for those areas.

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 22

The SWPPP for the Facility fails to comply with the requirements of Section X(H) of the General Permit.  The SWPPP fails to implement required advanced BMPs.  The SWPPP fails to identify and justify each minimum BMP or applicable BMP not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT.  General Permit, § X(H)(4)(b).

In addition, Section VII(C)(3) of the General Permit requires dischargers to amend the SWPPP with TMDL NEL exceedance information, and to certify and submit the SWPPP to SMARTS.  The Owner and/or Operator has failed to make these revisions since at least February 12, 2021.

The Facility's storm water samples and discharge observations have consistently exceeded applicable NELs, water quality standards, and EPA benchmarks and NALs, demonstrating the failure of its BMPs to reduce or prevent pollutants associated with industrial activities in the Facility's discharges consistent with the BAT and BCT requirements.  Despite these exceedances, the Owner and/or Operator has failed to sufficiently update the Facility's SWPPP.  In fact, the SWPPP has not been revised once since it was first prepared in January 2017.  The Facility's SWPPP has therefore never achieved the General Permit's objective to identify and implement BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges consistent with reductions achieved by implementing BAT and BCT at the Facility.

OCC puts the Owner and/or Operator on notice that it violates the General Permit and the CWA every day that the Facility operates with an inadequately developed, implemented, and/or revised SWPPP.  These violations are ongoing, and OCC will include additional violations as information and data become available.  The Owner and/or Operator is subject to civil penalties for all violations of the CWA occurring since March 23, 2017.

### E.      Failure to Comply with ERA Requirements.

On or about February 28, 2020, the Owner and/or Operator submitted a Level 2 Exceedance Response Actions ("ERA") Technical Report to SMARTS for discharges of copper and zinc during the 2019-2020 reporting year.[19]  Section XII(D)(2) of the General Permit sets out the requirements for a Level 2 ERA Technical Report.   For an Industrial Activity BMPs Demonstration, which is the type of Technical Report prepared by ADC, the General Permit requires, *inter alia*, the following:

iii. Where all of the Discharger's implemented BMPs, including additional BMPs identified in the Level 2 ERA Action Plan, achieve compliance with the effluent limitations of this General Permit and are expected to eliminate future NAL/TNAL

---

[19] The document frequently refers to the notion of a "monitoring year," which OCC assumes the Owner and/or Operator uses to refer to the "reporting year" set forth in the General Permit.

Alloy Die Casting Co.
March 23, 2022
Page 23

exceedance(s), the Discharger shall provide a description and analysis of all implemented BMPs;

iv. In cases where all of the Discharger's implemented BMPs, including additional BMPs identified in the Level 2 ERA Action Plan, achieve compliance with the effluent limitations of this General Permit but are not expected to eliminate future NAL/TNAL exceedance(s), the Discharger shall provide, in addition to a description and analysis of all implemented BMPs:

1) An evaluation of any additional BMPs that would reduce or prevent NAL/TNAL exceedances;

2) Estimated costs of the additional BMPs evaluated; and,

3) An analysis describing the basis for the selection of BMPs implemented in in lieu of the additional BMPs evaluated but not implemented.

General Permit, §§, XII(D)(2)(a)(iii)-(iv).

OCC alleges that the Owner and/or Operator has failed to comply with these requirements.  For example, the Level 2 ERA Technical Report fails to provide a description and analysis of all implemented BMPs.  The Report fails to estimate any costs of additional BMPs or an analysis describing the basis for the selection of BMPs implemented.  The need for additional BMPs and a revised Level 2 ERA Technical Report is underscored by the Facility's copper and zinc exceedances of NALs and applicable water quality standards during the 2020-2021 and 2021-2022 reporting years, subsequent to the submission of the Level 2 ERA Technical Report.

Although "[i]t is not a violation of this General Permit to exceed the NAL values; it is a violation of the permit, however, to fail to comply with the Level 1 status and Level 2 status ERA requirements in the event of NAL exceedances."  General Permit, Fact Sheet, p. 60.  Accordingly, OCC puts the Owner and/or Operator on notice that it has violated and continues to violate the General Permit and the CWA every day that the Facility operates without an adequate Level 2 ERA Technical Report since at least February 28, 2020.  The Owner and/or Operator is subject to civil penalties for each day it has failed to submit an adequate ERA report.

## IV.    Name and Address of Noticing Parties.

The name, address and telephone number of Orange County Coastkeeper is as follows:

Sarah Spinuzzi
Orange County Coastkeeper
3151 Airway Ave. Suite F-110
Costa Mesa, CA 92626
Tel. (714) 850-1965
sarah@coastkeeper.org

Alloy Die Casting Co.
March 23, 2022
Page 24

## V.       Counsel.

OCC has retained legal counsel to represent it in this matter.  Please direct all communications to:

> Douglas J. Chermak
> Michael R. Lozeau
> Lozeau Drury LLP
> 1939 Harrison Street, Suite 150
> Oakland, California 94612
> doug@lozeaudrury.com
> michael@lozeaudrury.com

## VI.       Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects the Owner and/or Operator to a penalty up to $59,973 per day per violation.  In addition to civil penalties, OCC will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)), declaratory relief, and such other relief as permitted by law.  Lastly, pursuant to Section 505(d) of the Act (33 U.S.C. § 1365(d)), OCC will seek to recover its costs and fees, including attorneys' fees associated with this enforcement action.

OCC believes this Notice Letter sufficiently states grounds for filing suit.  OCC intends to file a citizen suit under Section 505(a) of the Act against the Owner and/or Operator and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, OCC would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, OCC suggests that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  OCC does not intend to  delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Douglas J. Chermak
Lozeau Drury LLP
Attorneys for Orange County Coastkeeper

Notice of Violations and Intent to File Suit

Alloy Die Casting Co.
March 23, 2022
Page 25

## **SERVICE LIST – via certified mail**

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Eileen Sobeck, Executive Director
State Water Resources Control Board
1001 I Street
Sacramento, CA 95814

Merrick Garland, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Martha Guzman, Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Jayne Joy, Executive Officer
Santa Ana Regional Water Quality Control Board
3737 Main Street, Suite 500
Riverside, CA 92501-3348

**ATTACHMENT A**
Rain Dates, Alloy Die Casting Co., Fullerton, CA

| | | |
|---|---|---|
| 5/7/17 | 2/9/19 | 4/5/20 |
| 9/3/17 | 2/13/19 | 4/6/20 |
| 1/8/18 | 2/14/19 | 4/7/20 |
| 1/9/18 | 2/15/19 | 4/8/20 |
| 2/26/18 | 2/21/19 | 4/9/20 |
| 3/2/18 | 3/2/19 | 4/10/20 |
| 3/10/18 | 3/6/19 | 11/7/20 |
| 3/11/18 | 3/20/19 | 12/28/20 |
| 3/22/18 | 5/16/19 | 1/23/21 |
| 10/3/18 | 5/19/19 | 1/25/21 |
| 10/12/18 | 5/22/19 | 1/28/21 |
| 10/13/18 | 5/26/19 | 1/29/21 |
| 11/22/18 | 11/20/19 | 3/3/21 |
| 11/29/18 | 11/27/19 | 3/10/21 |
| 12/5/18 | 11/28/19 | 3/11/21 |
| 12/6/18 | 12/4/19 | 3/15/21 |
| 1/5/19 | 12/6/19 | 7/26/21 |
| 1/12/19 | 12/23/19 | 10/4/21 |
| 1/14/19 | 12/25/19 | 10/25/21 |
| 1/15/19 | 12/26/19 | 12/14/21 |
| 1/16/19 | 1/17/20 | 12/23/21 |
| 1/17/19 | 2/22/20 | 12/24/21 |
| 1/31/19 | 3/10/20 | 12/25/21 |
| 2/2/19 | 3/12/20 | 12/27/21 |
| 2/3/19 | 3/13/20 | 12/29/21 |
| 2/4/19 | 3/16/20 | 12/30/21 |
| 2/5/19 | 3/22/20 | 2/15/22 |